J-A02040-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: M.J.P., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.C.P., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1292 MDA 2023 |

Appeal from the Decree Entered August 18, 2023
In the Court of Common Pleas of Luzerne County
Orphans' Court at No(s):  A-9180

| | | |
|---|---|---|
| IN THE INTEREST OF: A.C.P., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.C.P., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1293 MDA 2023 |

Appeal from the Decree Entered August 18, 2023
In the Court of Common Pleas of Luzerne County
Orphans' Court at No(s):  A-9181

BEFORE:  NICHOLS, J., KING, J., and SULLIVAN, J.

MEMORANDUM BY SULLIVAN, J.:                    **FILED: MARCH 27, 2024**

J.C.P. ("Father") appeals from the decrees involuntarily terminating his

parental rights to his daughters, M.J.P., born in February 2012, and A.C.P.,

born in November 2007 (collectively, "the Children").[1]  Following our careful review, we are constrained to vacate and remand with instructions.

The factual and procedural history of this case is as follows.  Father was incarcerated in early 2016, following criminal convictions for, *inter alia*, homicide by motor vehicle – DUI related.  **See** N.T., 4/18/22, at 164.  Father's maximum date of incarceration was in January 2024.  **See id**. at 46, 163-164.  There is no dispute that Father completed all correctional programs required of him in the prison system and maintained phone contact with the Children.  **See id**. at 47-52, 106.

Mother, who was cohabitating with her paramour following Father's incarceration, gave birth to her paramour's son, J.S., in January of 2016.  **See id**. at 79-80.[2]  Mother and her paramour have a history of domestic violence which ultimately caused the Children's removal from her custody in October 2016.  **See id**. at 79-80.  On that date, the police arrived at Mother's home and found her intoxicated with dried blood on her forehead while the Children were present.  **See id**. at 80.  The police removed the Children, and the court placed them in the emergency custody of Luzerne County Children and Youth Services ("CYS").  **See id**. at 79-80.

---

[1] The trial court involuntarily terminated R.D.'s ("Mother") parental rights by separate decrees on August 18, 2023.  Mother did not appeal from either decree.

[2] J.S. is not a subject of this appeal.

In November 2016, the juvenile court adjudicated the Children dependent and established permanency goals of reunification. *See id*. at 80. On an unspecified date, CYS commenced monthly prison visits between the Children and Father. *See id*. at 104-105. These visits, however, ended at the time of the COVID-19 pandemic and never resumed. *See id*. at 105-06. The court ordered supervised telephone contact between Father and the Children in lieu of in-person visits. In March 2022, the court additionally granted Father video visits. *See id*. at 106; *see also* N.T., 5/9/22, at 17. Father would call the Children on Mondays, Wednesdays, and Fridays, and "most of the phone calls last no more than 10 to 15 minutes." N.T., 4/18/22, at 89.

On July 13, 2021, CYS filed petitions for the involuntary termination of Father's and Mother's parental rights to the Children pursuant to 23 Pa.C.S.A. § 2511(a)(1) and (b). The trial court initially appointed Todd Johns, Esquire ("Attorney Johns") as legal counsel *and* guardian *ad litem* for the Children. *See*, *e.g.*, Order, No. A-9181, 7/13/21. The court did not make an express determination whether Attorney Johns was capable of acting as the Children's legal counsel and guardian *ad litem*, but rather delegated that responsibility to counsel. *See*, *e.g.*, *id*. CYS filed amended petitions with respect to Father on October 12, 2021, wherein it averred that grounds for termination existed under, *inter alia*, 23 Pa.C.S.A. § 2511(a)(2).

For reasons not apparent in the record, the trial court then vacated its order appointing Attorney Johns and stated merely, "It is further ordered that Joseph Mashinski, Esquire [("Attorney Mashinski")] is hereby appointed Guardian *ad litem* for the [Children]." **See** Order, No. A-9181, 11/16/21. The trial court's order did not specify whether the trial court was appointing Attorney Mashinski, like prior counsel, to serve as the Children's GAL and legal counsel. The order did not contain an express determination that Children's best and legal interests did not conflict.

The involuntary termination hearing commenced on March 2, 2022, and continued on April 18, 2022, May 9, 2022, and March 1, 2023.[3] On the first day of the hearing, the Children had been living for over two years, along with J.S., in a pre-adoptive kinship home with their maternal aunt and uncle. **See** N.T., 5/9/22, at 6. By the conclusion of the proceeding in March of 2023, A.C.P. was fifteen years old, and had been transferred to a different pre-adoptive kinship placement. M.J.P., then eleven years old, remained in the original placement.

The Children testified separately *in camera* with respect to their relationships with Father and Mother and the termination of parental rights. **See** N.T., 3/2/22, at 7-51. A variety of other witnesses also testified during

---

[3] At no point during the hearings did the trial court make an express determination that Attorney Mashinski could serve the dual role of Child's GAL and legal counsel without a conflict.

the protracted involuntary termination hearing. CYS presented the following witnesses in support of its petition to involuntarily terminate Father's parental rights: CYS caseworker Krista Dean ("Ms. Dean"); A.C.P.'s court-appointed special advocate ("CASA") Sarah Mule, A/K/A Sarah Harris ("Ms. Harris");[4] M.J.P.'s CASA, Amy Martin ("Ms. Martin"); and Father's corrections counselor at State Correctional Institution ("SCI") – Dallas, Joseph DeLuca ("Mr. DeLuca"). Father testified on his own behalf *via* Zoom from SCI–Dallas.

One of the Children, A.C.P. testified that she was exposed in the family home to "people cursing all the time," to "sexual stuff," "alcohol" use, "fighting," and "violence." N.T., 3/2/22, at 9. She described Mother's acts of violence committed against her, including "one time she w[h]acked me over the head with a broom. One time she kneed me in the [eyes]. . . . I think I got little red dots in my eye. One time she sat on me to the point where I couldn't breathe." *Id*. at 11-12.

With respect to Father, A.C.P. testified that he "doesn't seem to understand that he put himself in jail. . . ." *Id*. at 12. She explained that he *has not* said to her, "[']Oh, this is my fault where I am, what I've done has affected you guys personally.['] He does not take accountability for that." *Id*. at 28. A.C.P. testified, "I cannot go back to live with my mom or my dad. . . . I want to live with my aunt and uncle and my siblings as a family. . . . I

_____

[4] This witness testified on May 9, 2022, and again on March 1, 2023. On the second date of her testimony, she was identified as Sarah Harris.

want them to be my mom and dad. That's what they are to me basically." *Id*. at 13. A.C.P. further emphasized, "this whole thing has been going on a really long time, like six years; since I was a kid. I'm going into high school next year and it started in elementary. That's like a really long time. This needs to be over soon. . . . I don't understand why I'm still in foster care." *Id.* at 14-15.

M.J.P. testified that she wants "to get adopted." *Id*. at 36. She testified, "I don't want to live with my mom or dad." *Id.* M.J.P. was four years old when she was removed from Mother's home. *Id.* at 37. She explained that she has no memory of living in the same house with Father, and she does not "know him well." *Id.* at 38. In addition, M.J.P. testified that she does not want continued phone contact with Father because "I don't know him." *Id.* at 44-45.

Ms. Dean, the CYS caseworker, testified that despite Father's contact with the Children during his incarceration, he has been unable to foster a positive relationship with them. *See* N.T., 4/18/22, at 90. Ms. Dean supervised video visits between the Children and Father in March and April of 2022, and she did not observe the existence of a parental bond. *See* N.T., 5/9/22, at 11, 20; N.T., 4/18/22, at 114-115. She explained, "They don't want to sit there with the video. They feel like they have to." N.T., 5/9/22, at 20. Ms. Dean also testified to an occasion where Father opened a conversation with the Children by telling A.C.P. that she looked "fat." *See*

N.T., 4/18/22, at 108.[5]  In addition, Ms. Dean testified, "The Children need a sense of permanency because they've been in placement for so long that they don't know what's going on in their life . . ., and I think they would feel a little more relieved if they had knowledge of what's going to happen to them."  N.T., 5/9/22, at 22.  Ms. Dean testified that while Father had petitioned the trial court for expansion of his contact with the Children, part of the reason Father's contact had not been expanded, subsequently, is because he did not want the Children coming to the prison to visit him following the pandemic.  *See* N.T., 4/18/22, at 106.  Ms. Dean testified that at no time during the life of these cases has Father demonstrated an ability to parent the Children on his own, nor was she aware of any plans he had to care for the Children upon his release from prison; nor has she seen any progress in the relationship between Father and the Children.  *See id*. at 88-89.

The Children's respective CASA testified that they need permanency and wish to be adopted by their kinship parents.  *See* N.T., 5/9/22, at 29-30, 33-34; 41-42, 46.  Specifically, Ms. Harris testified with respect to A.C.P., as follows.

> Q. . . .  [W]as it your impression that she wanted to be adopted because that would provide her with a certain amount of security going forward as to where she's going to be residing?
>
> A. One of the reasons.  Yes.

---

[5] Father later contested this; he testified, "I said to my [d]aughter . . . these video conferences via video make people look fatter than what they are." N.T., 4/18/22, at 162.

Q. Okay. What other reasons are there?

A. Safety; she feels like she can trust [the kinship parents]. [A.C.P.] does not feel like she has a sense of security [because she] doesn't know from one minute to the next whether she's coming or going. She doesn't know where she's going to end up. As she's looking towards her future, she wants to start making plans; and she feels like she can't do that until she has something permanent.

*Id.* at 34.

Ms. Dean testified that A.C.P. has not had contact with Father since she was transferred to the new kinship home in July 2022, and A.C.P. desires none. *See* N.T., 3/1/23, at 5, 11. Ms. Harris testified on the final day of the proceeding that A.C.P. "does not wish to have a relationship with her father."

*Id.* at 35. Ms. Harris explained:

[A.C.P.] has been very adamant even before her placement with [her new kinship parents]. She does not wish to continue those relationships [with Mother and Father].

She wants to take care of herself. She sees an ongoing need to take care of her mental health. I think as she gets older and becomes more aware, she is learning how to set her own boundaries and she's becoming vocal about what those are and what's best for her. . . ..

*Id.* at 33-34. Further, Ms. Harris testified as follows:

Q. . . . [H]ave you had conversations with [A.C.P.] about the possibility of resuming in-person contact [with Father] and whether or not that might start . . . healing that relationship?

A. We have had conversations about that. [A.C.P.]'s answer is the same every time. She does not wish to continue that relationship.

* * * *

- 8 -

Q. . . . [D]oes [A.C.P.] understand that her father will be released from incarceration in 11 months['] time?

A. I don't know if she knows the specific timeline but she's aware that he will be released.

Q. In the relatively near future —

A. Sure.

Q. Although 11 months for a 15[-]year[-]old may seem longer?

A. Right.

Q. Has she indicated in any way any change on her outlook with a relationship with her father based upon that imminent release?

A. She has not.

*Id*. at 37-39.  Ms. Harris elaborated:

Q. Do you, as her CASA worker, believe that it might be helpful for her to engage in any type of therapy to address relationship with her father?

A. I believe as it stands now [A.C.P.]'s main concern should be [A.C.P.].  She's got a lot of things that she's trying to work through that she's never had the opportunity to work through.

And I think now that she's taking that time it should be [A.C.P.]'s time.  As she continues to grow and heal and understand more as she gets older and has that perspective then she can decide for herself.

*Id*. at 39.

Unfortunately, prior to the conclusion of the protracted termination proceeding, A.C.P. suffered a mental health crisis and was hospitalized.  ***See***

*id*. at 8.[6]  As a result, in July 2022, she was transferred to a different pre-adoptive kinship home, that of her maternal half-sister and her husband.  *See id*. at 5, 14.  In January 2023, A.C.P.'s new kinship parents found her "cutting herself," and she was hospitalized again for two weeks.  *Id*. at 8-9, 15.  A.C.P. receives psychiatric services.  Her new kinship parents help facilitate those services and meet her mental and emotional needs.  *See id*. at 9, 21-22.  Indeed, Ms. Dean testified that A.C.P. views her new kinship parents as parental figures and wishes to be adopted by them.  *See id*. at 9-10, 12.

Ms. Martin, M.J.P.'s CASA, testified that M.J.P. seemed "well taken care of" and all of her needs were being met by her kinship parents.  *See* N.T., 5/9/22, at 40.  M.J.P. communicated to Ms. Martin that she wants to remain with her kinship parents, and Ms. Martin recommends adoption because "that [is her] home," she feels "very much at home there," and there is "definitely" a bond with her kinship parents.  *Id*. at 42.  Ms. Martin, based on her communications with M.J.P., testified that M.J.P. does not talk much with Father because she does not know him well enough.  *See id*. at 46.

Ms. Dean testified that M.J.P.'s kinship parents, her maternal aunt and uncle, wish to adopt her.  *See id*. at 6.  A.C.P.'s subsequent kinship parents,

---

[6] Ms. Dean testified that A.C.P. is diagnosed with "post-traumatic stress disorder, oppositional defiant [disorder], depressive disorder with psychosis, anxiety, . . . history of being abused. . . ."  N.T., 3/1/23, at 14.

her maternal half-sister and husband, wish to adopt her. **See** N.T., 3/1/23, at 5-6.

Father's prison counselor Mr. DeLuca testified that Father, upon his release from prison, is "looking to move in with his sister possibly. If not, there is a Veterans service placement that we can get for him." N.T., 4/18/22, at 48. Father testified to his confidence that he could seek employment with his sister who "owns restaurants," but expressed uncertainty about whether he would be able to care for the Children following his release. **See** N.T., 4/18/22, at 165-66.[7]

By decree dated August 14, 2023, and docketed on August 18, 2023, the trial court terminated Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2) and (b).[8] Father timely appealed, and both he and the trial court complied with Pa.R.A.P. 1925.[9]

Father raises the following issues for our review:

---

[7] Father testified that he was denied parole three times, and a final parole hearing was scheduled for October of 2022. **See** N.T., 4/18/22, at 164-165. Father was denied parole again at that time.

[8] Pennsylvania's Adoption Act ("the Adoption Act") governs involuntary termination of parental rights proceedings. **See** 23 Pa.C.S.A. §§ 2101-2938. Subsection 2511(a) provides grounds for the involuntary termination of parental rights. If the trial court finds clear and convincing evidence supporting the existence of one of the grounds for termination set forth in subsection (a), the court must then consider whether termination would best serve the child under subsection (b). **See id**. § 2511(b).

[9] This Court *sua sponte* consolidated Father's appeals. **See** Order, 10/2/23.

1. Whether the [t]rial [c]ourt abused its discretion and/or committed an error of law in determining the parental rights of [Father] to the subject minor children, M.J.P. and A.C.P., should be terminated pursuant to 23 Pa.C.S.A. § 2511(a)(2).

2. Whether the [t]rial [c]ourt abused its discretion and/or committed an error of law in determining the tenets of 23 Pa.C.S.A. § 2511(b) have been satisfied and the best interests of the subject minor children, M.J.P. and A.C.P., served by terminating the parental rights of [Father].

Father's Brief at 4.

Prior to reaching the merits of Father's appeal, we must first address *sua sponte* the representation provided by the Children's GAL. ***See Interest of A.J.R.O.***, 270 A.3d 563, 570 (Pa. Super. 2022). Section 2313 of the Adoption Act provides, in relevant part:

**(a) Child.**—The court shall appoint counsel to represent the child in an involuntary termination proceeding when the proceeding is being contested by one or both of the parents. The court may appoint counsel or a guardian *ad litem* to represent any child who has not reached the age of 18 years and is subject to any other proceeding under this part whenever it is in the best interests of the child. No attorney or law firm shall represent both the child and the adopting parent or parents.

23 Pa.C.S.A. § 2313(a). This Court has articulated the relevant law as follows:

Our Supreme Court has explained that "[s]ection 2313(a) requires the appointment of counsel who serves the child's legal interests in contested, involuntary [termination of parental rights] proceedings." ***In re Adoption of L.B.M.***, [] 161 A.3d 172, 180 ([Pa.] 2017) (footnote omitted). Further, the ***L.B.M.*** Court held that "***the failure to appoint counsel for a child involved in a contested, involuntary termination of parental rights proceeding is a structural error and is not subject to harmless error analysis***." ***Id***. at 183. ***Further, the failure to appoint counsel to represent a child's legal interests pursuant to [s]ection 2313(a) is a non-waivable error***. [***See In re***] ***T.S.***, 192 A.3d [1080,] 1087 [(Pa. 2018)].

- 12 -

Subsequently, [our] Supreme Court clarified that "trial courts are obligated by [s]ection 2313(a) to appoint counsel to serve the critical role of a child's attorney, zealously advocating for the legal interests of the child who otherwise would be denied a voice in the termination of parental rights proceedings." *In re Adoption of K.M.G.*, [] 240 A.3d 1218, 1233-34 ([Pa.] 2020) (citation omitted). In the context of TPR proceedings, the child's "legal interests" is synonymous with "the child's preferred outcome[.]" *T.S.*, 192 A.3d at 1082 (footnote omitted)[.]

Further, "where a child's legal and best interests do not diverge in a termination proceeding, an attorney-GAL representing the child's best interests can also fulfill the role of the attorney appointed per Section 2313(a) to represent the child's legal interests." *T.S.*, 192 A.3d at 1088 (citation omitted). However, "where there is no conflict between a child's legal and best interests, an attorney-*guardian ad litem* representing the child's best interests can also represent the child's legal interests. *Id*. at 1092; *see also K.M.G.*, 240 A.3d at 1235-36. As such, our Supreme Court has held that *before* appointing an individual to serve as both guardian *ad litem* (GAL) and legal counsel for a child, the trial court "must determine whether counsel can represent the dual interests . . .." *K.M.G.*, 240 A.3d at 1236. Further, where the trial court appoints one attorney "to represent both the child's best interests and legal interests, appellate courts should review *sua sponte* whether the [trial] court made a determination that those interests did not conflict." *Id*. at 1235.

*Interest of H.H.N.*, 296 A.3d 1258, 1263–64 (Pa. Super. 2023) (some citations omitted; emphases added).

Thus, where the trial court has appointed a single attorney to serve as GAL and legal counsel to represent both the child's best interests and legal interests, our Supreme Court has concluded an appellate court should review *sua sponte* whether the lower court made a determination that those interests did not conflict. *See A.J.R.O.*, 270 A.3d at 570 (*citing In re P.G.F.*, 247 A.3d

- 13 -

955, 964–65 (Pa. 2021)). Appellate review of this question does not involve second–guessing whether GAL/legal counsel in fact had a conflict, but solely whether **the trial court made the determination in the first instance**. **See id**.

If there is no indication in the certified record that the trial court has performed its section 2313(a) duty to determine whether the Children's best and legal interests did not conflict and that counsel could accordingly represent the dual interests without conflict, this Court cannot fulfill its duty to verify *sua sponte* that the trial court concluded the attorney could serve in the dual role without conflict. **See id**. at 570-71 (*citing* **K.M.G.**, 240 A.3d at 1236). In such a scenario, this Court has explained that the proper remedy is to vacate the termination decree and remand for further proceedings, after which the trial court is to fulfill its section 2313(a) duty to determine whether the attorney can represent the dual interests of the Children without conflict. **See A.J.R.O.**, 270 A.3d at 571. On remand, if the trial court determines that no conflict exists, the court is to re-enter its termination decrees. **See id**. If the court determines there is a conflict between the Children's legal and best interests, the court is to appoint separate legal counsel and conduct a new termination hearing to provide counsel an opportunity to advocate on behalf of the Children's legal interests. **See id**.

Following our review, we are constrained to vacate and remand. As noted above, the trial court appointed Attorney Johns to serve as GAL and

legal counsel for the Children, and did so without making the findings required by **K.M.G.** However, the court then vacated the appointment and appointed Attorney Mashinski **as GAL** for the Children. The record does not show whether the trial court intended to appoint Attorney Mashinski to serve as legal counsel for the Children, as it had done with Attorney Johns. Further, the record does not demonstrate that, if the trial court intended to appoint Attorney Mashinski to serve as GAL as well as legal counsel, the court determined Attorney Mashinski could represent the Children's dual interests without conflict. This is structural error not subject to a harmless error analysis. **See H.H.N.**, 296 A.3d at 1266.

Accordingly, pursuant to **A.J.R.O.**, we must vacate the termination decree and remand for the **limited purpose** of the trial court fulfilling its section 2313(a) duty to clarify whether Attorney Mashinski was appointed as GAL and legal counsel, and, if so, whether he could represent the Children's dual interests without conflict. **See** 270 A.3d at 570-71.[10] If the trial court

_____

[10] We observe that, as shown **supra**, the Children's testimony unequivocally demonstrates they sought termination of Father's parental rights and adoption, and the GAL's recommendation aligns with this. **See** N.T., 3/2/22, at 13-14, 36-37, 39-42; GAL Recommendation, 5/24/23, unnumbered at 8 ("I feel strongly that it is in the minor children's best interest to terminate parental rights . . .. I do recommend terminating the parental rights of . . . [Father], thus allowing the [C]hildren to be adopted and giving them the permanency they deserve. I do not feel that they will endure any detrimental effects [from] this termination . . .."). Nevertheless, this Court's *sua sponte* review is limited to whether: (1) the court appointed Children counsel; and (2) the trial court made the appropriate determination regarding the Children's
*(Footnote Continued Next Page)*

clarifies Attorney Mashinski was appointed to represent the Children's dual interests, it shall determine on the record whether there is a conflict between the Children's legal and best interests. If there is a conflict, the trial court shall appoint separate legal counsel and conduct a new termination hearing. If the trial court determines there is no conflict, the court shall re-enter its termination decrees after appointment of the current GAL as counsel of record.

Decrees vacated. Case remanded for proceedings consistent with this memorandum. Jurisdiction relinquished.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

Date: 3/27/2024

---

best and legal interests in the first instance. ***See A.J.R.O.***, 270 A.3d at 570 (*citing* ***P.G.F.***, 247 A.3d at 965)). ***See also H.H.N.***, 296 A.3d at 1263-64 (stating that a trial court's failure to comply with section 2313(a) is not subject to a harmless error analysis).